Nov. Term,
1856.

KITTERING
v.
PARKER.

ed to the Circuit Court, with instructions to dismiss the appeal.

*L. P. Milligan* and *J. R. Coffroth,* for the appellant.

KITTERING *v.* PARKER and Others.

Creditor's bill to set aside a conveyance alleged to have been fraudulently made. Uncorroborated testimony of one witness to fraud in the vendee, and that witness implicated by his own testimony as a participant in the fraud.

*Held,* that, under the R. S. 1843, p. 89, s. 44, the evidence did not sustain the bill.

*Held,* also, that the testimony of such a witness ought to be strongly corroborated, to authorize a decree upon it against the defendant's answer under oath.

The payment of a full price will not purify a fraudulent transaction; but such payment will be entitled to great weight where the proof of fraud is not clear.

*Monday,*
*November 24.*

ERROR to the *Warren* Circuit Court.

GOOKINS, J.—This was a creditor's bill, brought by *Parker* and others, to set aside a conveyance of land, alleged to have been fraudulently made by *Stewart* to *Kittering,* and to subject the land to the payment of *Stewart's* debts. *Stewart* made default. *Kittering* answered denying the fraud; The Circuit Court sustained the bill upon the proofs, and set aside the conveyance as fraudulent. *Kittering* being dead his representatives prosecute this writ of error.

The bill was filed *March* 20, 1846. It states that on the 10th of *September,* 1838, *Stewart,* jointly with *Isaac* and *Henry High,* made to *Parker* and *Baily,* the principal creditors, his notes amounting to 1,373 dollars, due 25 days after date. That suit was brought on these notes, *August* 12, 1839, in the *Warren* Circuit Court;

process was returned "not found," as to *Stewart*; the cause was removed by change of venue into the *Fountain* Circuit Court, where judgment was recovered against the *Highs*, at *May* term, 1842, for 1,672 dollars and 72 cents. That in *July*, 1844, the lands of the *Highs* were sold on execution, by the sheriff of *Warren* county, which, after satisfying some prior liens, and a part of the judgment in favor of *Parker* and *Baily*, left a balance of over 530 dollars, which is still unpaid. That this was all the property the *Highs* had, and they are notoriously insolvent. That *John Jennings*, another creditor, claims a debt due him from *Stewart*, June 1, 1839, of 300 dollars, for goods sold, &c.; and *Levi Jennings*, another plaintiff, claims against *Stewart* a judgment of 7 dollars and 28 cents, recovered *June* 29th, 1839, before a justice of the peace; and *Levi* and *John Jennings*, claim a judgment recovered against *Stewart* at the same time, for 12 dollars; and *David* and *John Jennings*, also, at the same date recovered a like judgment against *Stewart* for 24 dollars and 46 cents; all of which are alleged to be unpaid. That while so indebted *Stewart* owned the land in question, which, as described, appears to contain about 200 acres. That on the 24th of *June*, 1839, *Stewart* and his wife, with intent to defraud *Stewart's* creditors, conveyed the land to *Kittering*, who, when he received the conveyance knew of the existence of these several debts. That the lands were then worth 3,000 dollars, and that although the consideration mentioned in the deed was 1,500 dollars, the amount really paid was only 700 dollars. That the deed was executed late at night, *Kittering* being present; that immediately on making the conveyance *Stewart* absconded, and left the State; that *Kittering* received it knowing his intention to abscond, and that he assisted him in his flight; and that *Stewart* has never returned, and has no property except the land, out of which to make the debts. Prayer that the defendants be required to answer upon oath, that the conveyance be set aside as fraudulent, and for general relief.

*Kittering's* answer admits *Stewart's* indebtedness as stated in the bill, but denies any knowledge of it, at the time of his purchase except from rumor, and says he did not know the amount, and that he supposed it would have been long since paid by *Stewart* and the *Highs*, who, he understood, owned a valuable farm and other property. He admits the conveyance to him of the lands in question, but denies all fraud, and all knowledge of any fraudulent intent on the part of *Stewart.* He denies that the lands were worth more than 1,500 dollars; and states that he took the conveyance, subject to the lien of a judgment in favor of one *Evans* against *Stewart*, rendered at the *March* term, 1839, of the *Warren* Circuit Court, for 117 dollars and 78 cents; and another in favor of *James* and *John W. Anderson* against *Forshay* and *Fleming*, replevied by *Stewart* and one *Brenner*, on which a balance was then due of 622 dollars and 50 cents, one half of which *Brenner* agreed to pay if the principals failed to pay it, and he was to retain the other half, 311 dollars and 25 cents, out of said sum of 1,500 dollars to pay this amount, if it could not be collected from *Forshay* and *Fleming*, and the residue, being 1,071 dollars, he paid to *Stewart.* He states that executions having been issued on the judgments in favor of the *Andersons* and *Evans*, and levied upon the land, he was forced to pay the whole amount of them, *Brenner* having refused to pay one half of the *Anderson* judgment. He states that he has paid in all 1,826 dollars and 28 cents for the lands, which is more than their value, and offers to convey them to the plaintiffs if they will refund what he has paid. He admits that the deed was executed at night, and explains how it happened; denies that he had any knowledge of *Stewart's* intention to abscond, or that he aided him in doing so; and admits that *Stewart* has no property in this State subject to execution. This answer was filed *October* 5th, 1846.

On the 21st of *August*, 1849, *Kittering* filed an amendment to his answer, in which he states that, besides the

incumbrances mentioned in his former answer, he had been obliged to pay a balance of 119 dollars and 50 cents, upon a mortgage covering a part of the lands, made by *Stewart* to secure a surplus revenue loan, which he paid in 1841, but which he had forgotten when he made his former answer.

The most direct testimony upon the question at issue, is the deposition of *John Williams.* It is long, containing fifteen closely written pages, and it is not easy to give a summary of his evidence. The facts conceived to have a material bearing, are these: He states that he was present at the execution of the deed from *Stewart* to *Kittering,* and subscribed it as a witness. At *Stewart's* request, he had informed *Kittering* that he wished to sell his farm. *Kittering* offered 1,500 dollars for it, and *Stewart* replied that that was only just half what he had been offered by another; but he was then sick, and his creditors had sold his property, and they would sell his place. The witness and *Kittering's* son went to the clerk's office, to ascertain what liens were upon the land. The clerk informed them of the *Anderson* judgment and the surplus revenue mortgage. On their return with this information, a bargain was closed. It was then near night. *Clinton,* a justice of the peace, was sent for, to do the writing, who arrived after sunset. The examination of title papers and writing the deed occupied until midnight. During the taking of the acknowledgment of the deed, the parties retired, when *Kittering* said to the witness: "If I can hold this land I have made a fine 'trade." *Williams* advised him not pay the money unless he thought he could hold it. *Kittering* expressed the opinion, that by the laws of *Pennsylvania,* he could hold the land, and the witness, that the laws of *Virginia* would save him, but said he was not acquainted with the laws of *Indiana.* They returned into the house, the deed was delivered, and the justice went away. The money which was paid, was counted by the witness, and amounted to 700 or 750 dollars, or at most to 800 dollars. As soon as *Stewart* re-

Nov. Term.
1856.

KITTERING
v.
PARKER.

ceived his money, he said, "I must fix and be off from here," and proposed to the witness to carry him to *St. Louis*, which he declined. He applied to *Kittering* for the loan of his buggy, to which he assented, on condition that it should be returned to him at *Des Plains* or *Chicago*. *Stewart* said, "The man that catches me I wish he may hang me." *Kittering* replied, "Damn the danger;" and a further remark of *Kittering* is given by the witness, indicating that *Stewart* might travel with speed. *Stewart* had other money besides that received from *Kittering*, and on being asked by the witness how much he had, mentioned the amount so received, and 100 dollars from other sources, and said that was not half he had. *Kittering* asked *Stewart* if he was not going to pay *Parker* some of that money. *Stewart* replied that he was not; that *Parker* had cheated others, &c. The witness went with *Stewart* to assist in putting his horse to *Kittering's* buggy; and in pretending to do so, deceived *Stewart* by pricking the animal in the flank, and making him believe it would not work in a buggy. *Stewart* then left on horseback, having appointed a meeting with the witness in *Illinois* the next day. *Williams* met him there, when *Stewart* addressed him in presence of the family where he was stopping, remarking, "You have been detained buying them cattle some time." They went out, and after some conversation shook hands and parted, when *Stewart* left and has never returned.

This witness, on cross-examination, stated that *Kittering* was hard of hearing, and that he had to speak loud to him to make him hear; that it was his understanding that the money paid by *Kittering*, and the liens on the land, amounted to 1,500 dollars; that *John Kittering*, in company with the witness, called on *Brenner*, who promised to pay one-half of the *Anderson* judgment against *Forshay* and *Fleming*, if they did not pay it, that the *Evans* judgment was not taken into the account as a lien on the land, *Kittering* not having been informed of it; that *Forshay* left in his hands canal scrip worth 300 dollars, to pay on the *Anderson* judgment, which was taken into

Nov. Term,
1856.

KITTERING
v.
PARKER.

the account at the time of the sale by *Stewart* to *Kittering;* and that *Kittering* withheld the whole of the residue of that judgment, after deducting the 300 dollars.

*Clinton* testified that when he arrived at *Stewart's*, he found him in bed, complaining of being sick. *Kittering* and his son and *Williams* were there. The witness describes *Stewart's* manner in executing the deed, from which it is evident that he thought *Stewart's* sickness, in part at least, feigned. He saw no money paid. When the deed was executed, *Stewart* called his particular attention to what he was about to say, and then stated, that besides the consideration in the deed, *Kittering* was to pay all the liens on the land. *Kittering* asked if justice's judgments were liens, and was informed that they were not until filed and docketed in the Circuit Court. While he was writing, there was passing back and forth to the bed and whispering, but he could not say that the old man, *Kittering*, did so. This fact, and the circumstance that the three men, *Kittering*, his son and *Williams* were strangers to him, excited his suspicions that all was not right. He saw no money paid; and when the deed was executed, he went home and had not seen *Stewart* since.

*Brenner* testified that *Stewart's* land was worth, when he sold it to *Kittering*, 3,000 dollars, that *Kittering* had a conversation with him, in reference to the execution of the deed and *Stewart's* leaving, in which he stated that while the justice was writing, *Stewart* was in bed very sick, but as soon as the justice left he got up and began to bustle about; that he paid *Stewart* his money, who left the same night; that he was to give 1,500 dollars for the land, about 800 dollars of which he retained to discharge liens. He denied having promised to pay one-half of the *Anderson* judgment. *Kittering* had brought several suits against him to recover one-half the amount he had paid on it, but had failed to recover.

It was proved that *Kittering* paid 622 dollars and 50 cents, on the execution in favor of the *Andersons*, September 6th, 1839; that he paid the *Evans* judgment,

VOL. VIII.—4.

*October* 15th and 30th, 1839, 117 dollars and 78 cents debt, and 16 dollars costs; that in *July*, 1840, and *August*, 1841, he discharged the surplus revenue mortgage, amounting to 119 dollars and 50 cents, making in all 875 dollars and 78 cents, besides the sum paid down at the purchase.

The defendant examined four witnesses, touching the value of the land at the time of his purchase, one fixing it at 1,700 dollars, and the other three at 1,500 dollars. He also proved by *John Williams*, that on the 3d day of *September*, 1840, he bought of *Isaac High* his lands for 2,300 dollars.

The conclusion at which we have arrived, has made it necessary to rehearse the evidence in this cause very much in detail, though much less so than it was delivered. There are some circumstances connected with the alleged fraud which must be taken as established, among which are the indebtedness of *Stewart* and his absconding. It is also very evident that *Kittering* has not set forth truly in his answer, the consideration paid for the land. The amount paid on the *Evans* judgment, exclusive of costs, was 117 dollars and 78 cents, and on the *Anderson* judgment, 622 dollars and 50 cents, one-half of which, he says, he was to pay, being 311 dollars and 25 cents. These two sums make 429 dollars and 3 cents, which, deducted from 1,500 dollars, the price of the land, leaves 1,070 dollars and 97 cents; and he says he paid *Stewart*, in money, 1,071 dollars. It appears, however, from the proof, that *Kittering* had no knowledge of the *Evans* judgment until after his purchase; and the sheriff's return shows that 622 dollars and 50 cents was the precise sum long afterwards paid on the *Anderson* execution, including interest and the accruing costs. The amount of money stated to have been paid was, therefore, a forced balance, made upon data not in the possession of *Kittering* at the time of the transaction. This fact is stated that full weight may be given to every circumstance clearly appearing in the cause to sustain the decree.

*Stewart's* default establishes the fraud as to him; but that does not affect *Kittering*. Perhaps the testimony of *Williams* would, if that of one witness were sufficient, make out the plaintiff's case. That testimony would show that *Kittering* knew of *Stewart's* indebtedness to the plaintiffs, and it would be a reasonable inference from it, that he paid the purchase-money to *Stewart* with a knowledge of his intention to abscond, leaving his debts unpaid, and that he aided him in his flight. The doubt implied in saying he had made a good trade, if he could hold the land, showed that he apprehended an attack upon his title.

The answer being under oath, we are to consider whether the testimony of *Williams* is sufficiently corroborated to overcome it. We have seen that the statements of the answer relative to the consideration, were incorrect. The plaintiff's position is, that the *Anderson* debt was 622 dollars and 50 cents; that provision was made to pay 300 dollars of it; that *Kittering* was to get from *Brenner* 311 dollars and 25 cents, and thus get rid of the lien by the payment of 11 dollars and 25 cents; but the evidence does not sustain this position. *Williams* testifies that this sum of 300 dollars was in his hands, and was so understood to be by the parties, at the making of the deed; that he was to pay it, and did pay it, on the *Anderson* debt; and the execution shows a credit, *July* 12th, 1839, "by the hand of ———, 300 dollars." We have no doubt this was the money paid by *Williams*. *Lucas*, the clerk, testifies that when *John Kittering* and *Williams* applied to him for information as to the liens, he furnished a memorandum of all he knew of. We make the amount of the *Anderson* judgment, at that time, about 900 dollars. Deduct from this the amount in the hands of *Williams*, and 600 dollars would remain; to which add the surplus revenue mortgage, which was something over 100 dollars, and these taken from 1,500 dollars, the price of the land, would leave about the amount paid to *Stewart*, according to the testimony of *Williams* and the declaration of *Kittering*, proved by *Brenner*.

Reconciling this evidence as well as we can, we arrive at the conclusion that *Kittering* retained some 700 or 800 dollars to discharge the liens and paid the residue to *Stewart*. This, it is true, does not agree with the statement in the answer; but considering that *Kittering* was an old man, laboring under some of the infirmities incident to age,—that his answer was made more than seven years after the transaction,—and, especially, that he does not set up the mortgage as one of the liens, of which he was certainly informed at the time, and which he undoubtedly would have done had he remembered it,—it is the most reasonable conclusion, we think, that he was mistaken in the history of the transaction given in the original answer.

Independent of the circumstances already considered, the corroborating facts necessary to overturn the answer are few and feeble. The knowledge of *Stewart's* indebtedness, a rumor of which the answer admits, with the qualification that he supposed it would have been paid by *High*, is proved by *Williams* only, while it is shown that as late as 1840, *High* sold a farm worth 2,300 dollars. Admitting that *Stewart* made the declaration to *Kittering*, that his creditors would take his farm if he did not sell it, of which *Williams's* testimony is the only evidence, it may most reasonably be referred to the judgments of record, for the payment of which he was providing by the sale. Nor is there any corroborating evidence in relation to *Kittering's* knowledge of the intion of *Stewart* to abscond, previous to the execution of the deed and payment of the money, nor of his aiding him in his flight. The whole matter rests upon the unsupported testimony of *Williams*, who, if any fraud was committed, proves himself to have been an active participant in it. Such testimony ought to be strongly corroborated to authorize a decree upon it against the defendant's answer. There is no preponderance of evidence that the land was not paid for at its full value. It is true, that the payment of a full price will not purify a fraudulent transaction; but yet such payment will be

entitled to great weight, where the proof of fraud is not clear. The statute under which the case was tried is, that the plaintiff shall not have a decree against the defendant's answer, unless he shall sustain the allegations of his bill by two witnesses, or by one witness and corroborating circumstances. R. S. 1843, p. 839, s. 44. In this case the corroborating circumstances to prove the fraud are wanting, and the decree of the Circuit Court must be reversed.

*Per Curiam.*—The decree of the Circuit Court is reversed at the costs of the defendants in error, and this cause is remanded to said Court, with instructions to dismiss the bill.

*J. R. M. Bryant* and *R. A. Chandler*, for the appellant (1).

*R. C. Gregory*, for the appellees (2).